**PERFORMANCE PRICING, INC., Plaintiff,**

v.

**GOOGLE INC. and AOL LLC, Defendants.**

**Case No. 2:07–cv–432–RRR.**

United States District Court, E.D. Texas, Marshall Division.

March 18, 2010.

Sidney Calvin Capshaw, III, Daymon Jeffrey Rambin, Elizabeth L. Derieux, Capshaw Derieux, LLP, Longview, TX, Charles Ainsworth, Robert Christopher Bunt, Tyler, TX, Christin K. Cho, Gregory Scott Dovel, Richard Elgar Lyon, III, Dovel & Luner, Santa Monica, CA, for Plaintiff.

Antonio Sistos, Charles K. Verhoeven, David A. Perlson, Emily C. O'Brien, Jamie Lisagor, Joshua Sohn, Quinn Emanuel Urquhart & Sullivan LLP, San Francisco, CA, Jennifer A. Kash, Quinn Emanuel Urquhart & Sullivan, Redwood Shores, CA, Michael E. Jones, Potter Minton PC, Tyler, TX, for Defendants.

## SUMMARY JUDGMENT ORDER

RANDALL R. RADER, Circuit Judge.

Defendants Google Inc. ("Google") and AOL LLC ("AOL") move for summary judgment of non-infringement of U.S. Patent No. 6,978,253 (the "'253 patent"). Because no genuine issues of material fact prevent a judgment of law that the accused products do not have a "price-determining activity" as that term is used in the '253 patent, this court grants Defendants' motion.

### I.

Plaintiff Performance Pricing, Inc. ("Performance Pricing") accuses Defendants of infringing claims 1, 2, 12–15, 18, 20–23, and 30 of the '253 patent, titled "Systems and Methods for Transacting Business Over a Global Communications Network Such as the Internet." (D.I. 253 [1] at 5 ¶ 8; D.I. 279 [2] at 1.) The patent claims methods of doing business over the Internet "wherein various forms of competition and/or entertainment are used to determine transaction prices between buyers and sellers." '253 patent, col. 1 ll. 10–14. Specifically, the patent discloses methods for using a "price-determining activity," or PDA, to market on the internet. *Id.* at col. 1 l. 59. The patent describes a PDA as a "collateral activity" that "ultimately determines the price of the product or service to be secured, depending on the buyer's performance during the collateral activity." *Id.* at col. 1 ll. 59–62. In other words, "[t]he ultimate price [of the product or service] ... is determined based upon the buyer's performance rating, or score, which the buyer receives from participating in a collateral activity." *Id.* at col. 2 ll. 23–25.

The specification broadly describes the types of activities that constitute a price-determining activity, such as "a video game (including audio/visual games), electronic board game, crossword puzzle or other word game, sports bet, card game, or any other activity or combination of activities." *Id.* at col. 2 ll. 28–31. For example, the patent suggests that a seller might offer a Mark McGwire rookie card for anywhere between $500 to $575. *Id.* at col. 5 ll. 44–47. (The application for the '253 patent was filed on June 29, 1999, the year after Mr. McGwire broke Major League Baseball's single-season home run record. *See* Rogers, Phil, "Mark McGwire; Over the Fence and Into History," *Chicago Tribune,* Sep. 9, 1998, at A1.) According to this embodiment of the invention, a buyer who is interested in purchasing the McGwire card is then present-

---

**1.** D.I. 253 is Defendants' Motion for Summary Judgment of Non-infringement.

**2.** D.I. 279 is Performance Pricing's Opposition to Defendants' Motion for Summary Judgment of Non-infringement.

ed with a pull-down menu of five different PDAs to choose from:

> 1) a bridge game where [the buyer] would be dealer and North, and would be playing with three other individuals who have selected bridge as their PDA for other products ...; 2) a Mark McGwire trivia quiz of ten questions; 3) an offer to predict which major league baseball player will be the first to reach fifty home-runs this season; 4) a game of keno; and 5[sic] a classic PacMan video arcade game.

*Id.* at col. 5 ll. 53–60. Addressing the trivia quiz in particular, the specification explains that the seller might offer the card for $500 if the buyer answers nine of ten multiple choice questions correctly and $560 if he answers five of ten correctly. *Id.* at col. 5 ll. 60–66.

All of the asserted claims require the price of a product to be based on a "performance of [a] buyer while participating in a Price–Determining–Activity (PDA)." *Id.* at col.9 ll. 38–40 (claim 1), col. 10 ll. 41–43 (claim 18), col. 11 l. 20—col. 12 l. 1 (claim 30). Representative claim 1 reads in full (emphasis added),

> A method of doing business over a global communications network comprising the steps:
>
> > communicating to a buyer via the global communications network, a description of a product;
> >
> > accepting a first request from the buyer to buy the product for a price to be determined within a price range;
> >
> > accepting a second request from the buyer to allow the *price to be determined based upon a performance of the buyer while participating in a*

> > *Price–Determining–Activity (PDA);*
> >
> > receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the PDA; and
> >
> > determining the price of the product based at least partially upon the data received, said price being within the price range and scaled to the performance of the buyer.

One of the asserted dependent claims, claim 13, further states that "the price is determined at least partially upon participation of the buyer in an auction."

## II.

Performance Pricing accuses AdWords, Google's online advertising auction system, of infringing the '253 patent. (D.I. 253 at 6 ¶ 13.) AdWords is an auction system used to sell Internet advertising space in connection with search results on Google.com and on its partner sites. (*Id.* at 7 ¶ 14; D.I. 279 at 1 ¶ 14.)

AdWords works in the following manner. (*See* D.I. 253 at 7 ¶¶ 14–17; D.I. 279 at 1–2.) Each time an end user enters a search query on Google.com, AdWords runs an auction for the ad space available on the search results page displayed to the end user. To participate in AdWords auctions, the following must be submitted: ad text, a bid amount, and a keyword that the advertiser wishes to associate with its ad text. The ad text includes a title, up to two additional lines of description, and a web address that represents the advertiser's website (a "display URL"). (D.I. 256[3] at 2 ¶¶ 6, 8; D.I. 287[4] at 6 ¶¶ 6, 8.) For example, an advertiser for the website BeachDestinations.com might submit as ad

---

**3.** D.I. 256 is Performance Pricing's Motion for Summary Judgment of Infringement.

**4.** D.I. 287 is Defendants' Opposition to Performance Pricing's Motion for Summary Judgment of Infringement.

text the title and description "Hawaii Island Hopping / Combine Oahu, Maui, Kauai, Lanai / +more. Book in 30 seconds & Save!" and the display URL "BeachDestinations.com." The bid amount is typically expressed as the "Maximum CostPer–Click." The Maximum Cost–Per–Click indicates the maximum price that an advertiser is willing to pay to Google in compensation for listing the advertisement if an end user clicks on the link to its webpage in its ad.

In each AdWords auction, AdWords ranks the eligible ads based on their "Ad Rank." (D.I. 253 at 7 ¶ 15.) Winning ads are displayed to the end user such that ads with higher Ad Ranks have priority over ads with lower Ad Ranks in the same ad block:

(*Id.*) In other words, the winning bid in the above example, Kauai Inn Recession Rates, won the top listing in the ad block as shown.

Ad Rank is calculated based on the advertiser's Maximum Cost–Per–Click bid and what Google refers to as the "Quality Score":

Ad Rank = Maximum Cost–Per–Click × Quality Score

AdWords computes a Quality Score for each eligible ad that predicts the likelihood that the end user will click on the ad in that particular auction. (*Id.* at 8 ¶ 16; D.I. 279 at 1 ¶ 16.) Google's proprietary Quality Score algorithm includes many parameters, one of which might be the ad text.

Quality Score is also used to calculate the price an advertiser will pay if an end user clicks on the ad. Google refers to the price as "Actual Cost Per Click." The Actual Cost Per Click is calculated according to the following formula: Actual Cost Per Click = next-best Ad Rank/Quality Score.

Performance Pricing also accuses AOL Search Marketplace of infringing the '253 patent. (D.I. 253 at 13 ¶ 33; D.I. 256 at 1 ¶ 3.) Defendant AOL uses the search technology in Google's AdWords in providing its AOL Search Marketplace. The record shows no relevant differences between the operation of Google's AdWords and the operation of AOL Marketplace for determining infringement of the '253 patent. This court's discussion of AdWords therefore applies equally to AOL Search Marketplace.

III.

Performance Pricing initiated this action on September 27, 2007. The court referred the case to a Magistrate Judge on

November 26, 2007 to conduct pretrial proceedings. (D.I. 39.) Following extensive briefing and a claim construction hearing, the Magistrate Judge construed the disputed terms of the asserted claims. *See Performance Pricing, Inc. v. Google Inc.*, No. 2:07–432, 2009 WL 2497102 (Aug. 13, 2009) (*Markman Order*). As relevant here, the court construed "price-determining-activity" to mean "any form of competition or entertainment activity or combination of such activities that is used to determine the price paid for the product or service and is *not otherwise part of a sales transaction.*" *Id.* at *4 (emphasis added).

The parties then filed cross motions for summary judgment on the issue of infringement. (D.I. 253, 256.) Performance Pricing argues that the "price-determining activity" in AdWords is the creation and submission of the most relevant advertisement for a keyword. (D.I. 256 at 9.) In response, Defendants argue, among other things, that AdWords does not have a price-determining activity because the ad text that the buyer submits is what is displayed on a search result page. Thus, Defendants contend, the buyer's submission of relevant ad text plays a "part of [the] sales transaction" in addition to determining price. (D.I. 253 at 15.)

## IV.

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is inappropriate if a reasonable jury could return a verdict for the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ In order for a court to find infringement, the patentee must show the presence of every element of an asserted claim or its substantial equivalent in the accused device. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed.Cir.1985). When a patentee fails to show that the accused device can infringe the properly construed claims either literally or under the doctrine of equivalents, a trial court may appropriately enter summary judgment. *PSN Illinois, LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1166–68 (Fed. Cir.2008).

■ As noted, Performance Pricing argues that the price-determining activity in AdWords is creating and submitting the most relevant advertisement for a keyword. Performance Pricing contends that the advertiser's submission of a relevant advertisement is not part of the sales transaction because the relevancy of the ad is not a price term nor does it delineate the space that the advertiser desires to purchase. (D.I. 279 at 4.)

To the contrary, AdWords does not contain a price-determining activity. The record shows that Google requires the advertiser to submit the very ad text that Google will display in the ad space. Thus, the advertiser's submission of the most relevant ad text necessarily defines the product itself. After all, the product (or service) on the market is the advertising space offered by Google. Indeed the quality of the advertiser's submission—that is, the quality of its proposed advertisement—may influence the selection process for the ad space. AdWords is not at all akin to a buyer correctly answering baseball trivia in order to obtain a lower price on a separate pre-existing baseball card. Instead, the submission in this case actually becomes a part of the product by taking its place in the ad space. Thus, the advertiser's submission is "otherwise part of the sales transaction." Putting this into the baseball card example of the patent, this

AdWords method is akin to a buyer winning a contest to design a better baseball card with the prize being the opportunity to purchase the very card that the designer proposed at a lower price. Or maybe it would be winning the baseball trivia contest to win the chance to purchase a baseball card with the buyer's answers imprinted on the back of the card. In other words, the buyer's performance in AdWords not only affects the price, it affects, and in a sense actually becomes part of, the product.

In addition to the content of the ad and its price, the ad text in AdWords is also part of the sales transaction because its relevancy to an end-user's search query determines where on the page the ad will appear. Stated another way, the record shows that the advertising space purchased by the buyer actually changes based on its performance in submitting effective ad text. Thus, AdWords decides if a submission appears in the first, second, third, or lower ad space on the page. Once again, the submitting activity changes the product itself.

On this record, Performance Pricing does not succeed in creating any genuine issue of material fact. In an attempt to create a factual dispute, Performance Pricing contends that the sales transaction in AdWords is for advertising space divorced from the relevancy of the ad. Defendants, Performance Pricing argues, conflate the sales transaction (i.e., the agreed upon terms of sale) with the parties' performance of that same transaction. As an example, Performance Pricing points to the sale of airtime for a commercial advertisement on television. Although the sales transaction in that case would include agreement on the price terms and on some level of detail regarding the airtime being sold (e.g., time duration, time of day, day of week, etc.), the writing and filming of the ad itself would not be a part of the transaction. In support of the television analogy, Performance Pricing points to Google's Chief Economist's admission that he would not consider the actual filming and creating of a television commercial to be part of a sales transaction in that scenario. (D.I. 279 at 6.)

Performance Pricing's television analogy does not create a factual dispute. The analogy does not show that AdWords infringes by requiring a price determining activity, the most crucial aspect of the claims. A normal transaction for commercial airtime might very well be separate from the content of the ad itself—for example, if a broadcaster sells advertising space without any requirements about the content of the advertisement. That alternative hypothetical transaction, however, reveals nothing about the situation in this case. A better analogy might be where a broadcaster sells commercial airtime at a lower price to the advertiser with the more entertaining ad. As it stands, however, Performance Pricing's analogy is a non-sequitur and does not introduce a factual dispute into this record.

Performance Pricing also points to the following deposition testimony from Google's non-infringement expert to support its argument that the submission of relevant ad text is not part of the sales transaction:

Q. There was a time when Google and Yahoo did not use a quality score ... [when] it calculated the price of ads. Correct?

A. Right.

. . .

Q. Would you agree, then, that apart from Google starting to use quality score ..., that the buyer's ability to create relevant ad text is not part of the sales transaction?

[Objection omitted]

A. To my knowledge, the ad text was not considered by Google and therefore didn't become part of the basis of the bargain other than, you know, for possibly objectionable ads. But for normal ads that they accepted, it didn't matter what the ad said.

Q. And therefore it was not part of the sales transaction, right?

[Objection omitted]

Q. Right?

A. Right.

(D.I. 279, Ex. 8 at 347:17–351:25.) As the excerpt makes clear, however, this testimony addressed only a previous Google product that did not rely on Quality Score. Nothing in the record indicates that Google's previous method of selling advertising space was tied at all to the ad text, as a price-determining factor or otherwise. Thus, Google's expert's testimony that "ad text *was not* considered by Google" and that it "*was not* part of the sales transaction" (emphasis added) does not create a genuine issue of material fact as to whether Google presently uses relevant ad text as a part of the sales transaction in addition to determining price.

As a final argument, Performance Pricing contends that once Google decided to start using relevant ad text to determine price in its system, it had to also start using that same text to determine where the ad would be placed in the search results in order for the price and results to remain symmetrical and fair. (D.I. 279 at 6.) Performance Pricing concludes that "this does not make an activity that would not be part of a sales transaction (if not combined with an auction) into an activity that is part of [a] sales transaction simply because it now influences price and auction results." (*Id.*)

The court perceives this argument to be, essentially, that if one is going to use a price-determining activity as a part of an auction, the activity must necessarily affect the results of the auction (here, what ad appears first, second, third, etc.) as well as price. Otherwise, for example, the advertiser with the second-place ad might end up paying more than the advertiser with an ad in first place.

Performance Pricing seems to be arguing for an exception to the court's claim construction for price-determining activity when the activity is combined with an auction. More specifically, Performance Pricing appears to be contending that a price-determining activity can influence something more than price (here, auction results) because the activity is part of an auction. This court need only note that the claim construction does not permit that expanded interpretation. Indeed, the parties stipulated during claim construction that "an auction is not a PDA." *Markman Order*, 2009 WL 2497102, at *10.

Dependent claim 13, which claims a method where the price is determined "at least partially upon participation of the buyer in an auction," does not require the court to revisit its claim construction. The specification describes the embodiment where price is partially determined based on an auction as "the buyer may be entitled to a *further* discount of the auction or reverse auction price, which discount may be greater if the buyer performs well at the PDA, and not so great if the buyer performs poorly." '253 patent, col. 4 ll. 39–44 (emphasis added). Thus, the patent does not contemplate a different construction of price-determining activity in the auction context (nor has Performance Pricing provided any legal support that would justify construing a term differently in different factual contexts).

Instead, the specification describes a scenario unlike AdWords where the auction results and the discount attributed to the buyer's performance in the price-determining activity are independent. In the

auction scenario described in the '253 patent, the winner of the auction might very well pay a lower price than the second-place bidder if the winner goes on to perform well in the price-determining activity. Therefore, even Performance Pricing's premise—that a price-determining activity in an auction must also be used to rank the winners of the auction—is not one that is shared by the '253 patent.

Performance Pricing's doctrine of equivalents argument is also based on the argument that "[a]part from Google's decision to use [Quality Score] in determining price, the competitive activity of creating an advertisement that is most relevant to a user's search would not have a role in the sales transaction." (D.I. 279 at 10.) But, as already explained, Google's decision to use Quality Score to determine price and ad rank together in its auction system is fundamentally different than the auction system described in the patent, namely, a system where a price-determining activity may separately reduce the price determined through an auction. Thus, Performance Pricing does not show that AdWords has a feature that operates in "substantially the same way" as the claimed price-determining activity. *Wavetronix LLC v. EIS Electronic Integrated Systems*, 573 F.3d 1343, 1360 (Fed.Cir. 2009).

AdWords contains no PDA at all as defined in the claim construction. Specifically, the AdWords algorithm selects winners for its ad space based on activities that are "otherwise part of the transaction." This court determines that on this record, summary judgment of non-infringement is therefore appropriate.

### V.

The parties have presented no genuine issues of material fact. All parties agree as to the operation of the accused systems. The accused products do not, even when construed broadly, include a price-determining activity as taught within the context of the '253 patent. Summary judgment of non-infringement as to all asserted claims is therefore GRANTED. The parties are requested to file a joint statement by MARCH 19, AT 5:00PM, identifying any remaining issues in the case in light of this summary judgment order.

It is SO ORDERED.